UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                        :
MILTON BALKANY,                         :
                                        :
                    Petitioner,         :        12 Civ. 8884 (DLC)
                                        :
        -v-                             :        OPINION & ORDER
                                        :
UNITED STATES OF AMERICA,               :
                                        :
                    Respondent.         :
                                        :
--------------------------------------- X

For petitioner:

Jeremy Gutman
233 Broadway, Suite 2707
New York, NY 10279

For respondent:

Preet Bharara
Marc P. Berger
United States Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007


DENISE COTE, District Judge

     Milton Balkany ("Balkany") has filed a petition for a writ
of habeas corpus pursuant to 28 U.S.C. § 2255 on the ground that
his rights under the Sixth Amendment to the United States
Constitution were violated when three of his adult children were
excluded from the courtroom during a portion of the voir dire at
his criminal jury trial.  For the following reasons, the
petition is denied.

1

I. Background

On May 20, 2010, a four count indictment was filed charging Balkany with extortion, wire fraud, blackmail, and making false statements to law enforcement.  The trial began on Monday, November 1.  The Government's evidence, which included recordings of the defendant, showed that Balkany, a rabbi and dean of a religious school, tried to extort a hedge fund and blackmail its CEO to obtain millions of dollars.  To further his crime, Balkany called the United States Attorney's Office and lied to a law enforcement officer.  Balkany did not present a defense case.  On November 10, the jury convicted Balkany on all four charges.  At trial, Balkany was represented by experienced and able defense counsel, Benjamin Brafman.

On February 18, 2011, the Court imposed a non-guidelines sentence of principally 48 months' imprisonment.  The guidelines range was 87 to 108 months' imprisonment.  At sentencing, Balkany was represented by retained counsel Alan Kaufman and James Keneally.

Balkany appealed, raising three arguments.  None of them relates to the issues posed by this petition.  The conviction was affirmed by summary order on March 19, 2012.  During his appeal, Balkany was represented by retained counsel Paul Schechtman.  On December 6, 2012, Balkany filed the instant petition.  It raises a single issue based on the Court of

Appeals' decision a month earlier in <u>United States v. Gupta</u>, 699
F.3d 682 (2d Cir. 2012).  Supported by three affidavits, it
asserts that Balkany's Sixth Amendment rights were violated at
trial when three of his children were prevented from entering
the courtroom during the morning session when approximately two-
thirds of the <u>voir dire</u> was conducted.[1]  One of the three
children expected to be of particular assistance to her father
in selecting a jury since she had once attended a lecture by a
psychologist regarding jury selection.  She planned to share her
impressions of the venire with her father during the lunch
break.

A description of the courtroom's entrance will be of
assistance in understanding what the children have described in
their affidavits.  The courtroom in which the trial occurred is
on the 11th floor of the Daniel Patrick Moynihan Courthouse.
When one exits the public elevators, one steps into a spacious
hallway.  The courtroom is marked by a number -- 11B -- and the
presiding judge's name.  Inside the first set of double doors
that lead into the courtroom, there is a vestibule.  To the
right of the vestibule, as one enters, there are two witness
rooms.  To the left of the vestibule is the jury room.  The
doors to both the witness rooms and jury room are marked by

---

[1] Balkany had 13 children, all of whom were adults.  Many
attended the trial.

signs.  A sign to the side of the jury room door reads: JURORS.
As one walks straight through the vestibule, one enters the
courtroom through a second set of double doors

In their affidavits, three adult children of the defendant,
one of his daughters and two of his sons, explain that they met
on the courtroom floor and together walked into the vestibule
outside the courtroom.  Audel Hecht reports that as they "were
about to open the second set of doors" and enter the courtroom,
a woman whom she later learned was the Court's "assistant" told
them that "[they] could not enter and would have to wait
outside."  Ms. Hecht adds, "we were not allowed into the
courtroom until after the recess at lunchtime."  Her brother,
Menachim, repeats that description of the events.  Neither
affiant explains what was done or said to prevent them from
entering the courtroom after their initial interaction with the
"assistant."

Shmuel, the second brother, adds that as he arrived on the
courtroom floor he "saw a line of people being led into the
courtroom."  He came to understand that these were the
prospective jurors.  When his brother and sister arrived on the
courtroom floor, the three of them tried to enter the courtroom
together.  Then,

> [a]s we approached the second set of doors, which led from
> the entry vestibule into the courtroom, a woman (whom I
> later learned was the Judge's assistant) told us we had to

> wait outside.  We remained outside the courtroom for
> several hours.  At one point, when I entered the vestibule
> to try to peek inside, I saw the Judge's assistant allow a
> man, who I later learned was a newspaper reporter, enter
> the courtroom, but the assistant did not let me or my
> family members enter.

It is unclear to whom Shmuel is referring since no "assistant"
to the Court would have been positioned near the back of the
courtroom after the venire had finished entering the courtroom.
He also does not explain what the assistant did or said to
prevent him from entering the courtroom at the time the reporter
entered.

The trial transcript does not reflect that the Court closed
the courtroom to any member of the public at any point during
the trial, and indeed the Court did not close the courtroom at
any point to any observer.  Balkany's wife, and many of his
children, other relatives, and supporters attended the entire
trial, as well as members of the press.  The Court also did not
know at any time during the trial that anyone believed that they
had been excluded from the courtroom.

It would appear that the events described by the three
children occurred at about 10:30 a.m. on November 1.  November 1
was the first day of trial, and proceedings began at 9:30 a.m.
For almost an hour, the Court addressed evidentiary and legal
issues with the parties.  Members of Balkany's family were in
the courtroom observing proceedings during that entire time.  At

about 10:25 a.m., the Courtroom Deputy learned from the Jury Administrator's Office that it was ready to send up the venire.[2] The parties asked to take a recess before jury selection, and a brief recess was called.

When court proceedings resumed, the defendant had not yet returned to the courtroom, and defense counsel left the courtroom to retrieve him.  When Mr. Brafman returned with the defendant, Mr. Brafman reported that the prospective jurors were in the hallway and he had recognized one person in the venire. Neither Mr. Brafman nor the defendant brought any additional family member with them into the courtroom or reported that any other family member was outside.  During this break in the proceedings, the family members and all other spectators who were in the courtroom were asked to sit at the back of the courtroom, on one of the benches that runs along the back wall, to make room for the venire.

It is the established practice of the Courtroom Deputy at this stage of the proceedings to go to the back of the courtroom accompanied by a law clerk.  Each of them holds a stack of juror questionnaires.  As the venire members, about sixty individuals,

---

[2] Prospective jurors are scheduled to arrive at the courthouse at 8:30 a.m.  They receive an orientation, which includes the showing of a film on jury service, and then names are called for the panels that will be sent to the courtrooms where trials will begin that day.  A venire is usually ready to be sent to a courtroom between 10:20 a.m. and 10:30 a.m.

entered the courtroom, the Deputy and law clerk held the doors
to the courtroom open for them to enter and handed each of them
a questionnaire.  It was apparently just after this point in the
proceedings that the three affiants approached someone whom they
came to understand was the Court's assistant.  The defendant
acknowledges that the assistant would have had no way to know
with whom she was speaking.

When the Deputy and law clerk finished handing out the
questionnaires, and with the assistance of oral instructions
from the bench, the Deputy directed members of the venire to
fill the open seating in the courtroom gallery.  At this stage
in the proceedings, there is often not enough seating for every
member of the venire, and some of them remain standing.  The
Deputy walks along the aisles in the courtroom, urging people to
sit more closely together and finding seating for as many
persons as possible.  Here, the record reflects that the Deputy
asked if any prospective juror did not have a questionnaire.
After she has finished assisting any members of the venire in
the courtroom gallery, she comes to the front to the courtroom
to assist in jury selection.  From this moment on, the Deputy is
assisting the Court and prospective jurors from the front of the
courtroom.  Among other tasks, the Deputy will pull the names of
individual members of the venire from a "wheel" and direct them
to their places in the jury box.  There would have been no

opportunity for the Deputy to have any interaction with anyone
at the rear of the courtroom for the remainder of the morning
court session.  No one from the Court's staff is stationed near
the doors leading to the courtroom.

     After as many members of the venire were seated in the
courtroom as possible, the Court gave opening remarks for
approximately five to ten minutes.  After those opening remarks,
eighteen members of the venire were seated in the jury box.
Then everyone in the first two rows of seating in the courtroom
was asked to stand, and eighteen more members of the venire were
seated in the order in which their names had been called.  After
the thirty-six members of the venire were seated, seating was
available for everyone in the courtroom, and there was no need
for anyone to remain standing.  The Court instructed jurors who
were standing or any who were sitting on the second bench
against the back of the courtroom to move up and be seated in
the open seating.  From this point on, there were two benches in
the back of the courtroom that were available for seating for
observers of the jury selection process.  If there had been a
need for additional seating for observers beyond that provided
by the two back benches, that would have been created in the
back rows of the gallery seating.

     At this point, the questioning of the individual jurors
began.  The Court read aloud each question on the questionnaire

to the first juror.  With every succeeding juror, the Court
simply asked whether that juror had a "yes" answer to any of the
questions on the questionnaire, followed up with additional
questioning if a juror indicated that he or she had a "yes"
response to a question, and asked the juror to respond to the
individual, biographical questions.

The morning session ran to 12:45 p.m.  During the morning
session, the Court questioned twenty-five prospective jurors.
Of the twenty-five, six were excused for cause on consent.
Seven of the twenty-five were heard partially at sidebar at
their request to address sensitive information.  As the jury was
excused for lunch with instructions from the Court, the Court
requested the visitors to remain seated in the courtroom until
the jury had left.  The Court said,

> I'd like the others to be seated, please.  I want to make
> sure that all our visitors in the courtroom, friends and
> family members or others who are interested, are aware that
> they are to have no contact whatsoever with the jury.  They
> are not to say hello to any jury members or any potential
> jury member; no conversation whatsoever.  Thank you very
> much.  I deeply appreciate your cooperation.  It's
> important to us, and I greatly appreciate it.

During the afternoon session, which began at 2:00 p.m.,
twenty-one more members of the venire were questioned and four
were excused for cause on consent of both parties.  Four of the
twenty-one asked to answer some of the questions at the sidebar.

9

After thirty-six prospective jurors were qualified, the
Court heard counsel at sidebar regarding any additional
objections for cause or requests for additional questioning.
Then the parties simultaneously exercised their peremptory
challenges in two rounds.  Through the first round they chose
the first twelve jurors; through the second round they chose
four alternates.  After each round, the challenged jurors were
asked to stand in the back of the courtroom so that counsel
could observe who had been excused and who remained seated as a
juror.  Only after counsel agreed were members of the venire
excused.  Jury selection concluded at about 3:20 p.m.

The jury was then asked to accompany the Deputy to the jury
room.  During this break in the proceedings, the Court again
addressed the courtroom visitors and invited them to move into
the open seating in the courtroom:

> I want to thank the family members and other visitors who
> have been with us today and who were so cooperative.  Much
> appreciated.  You can move forward now and sit wherever you
> would like comfortably in the courtroom.  Of course I
> remind you, you can't have any contact with the jury, no
> statements, no nods, no type of communication.  And thank
> you so much for helping us.

When the jury returned to the courtroom, at about 3:45
p.m., the oath was administered; the Court gave opening
instructions, the parties delivered their opening statements,
and the first witness began his testimony.  At no point during

that day or at any time during the trial did anyone complain that someone had been excluded from the courtroom.

Many family members of the defendant and others attended the entire trial.  For example, during the afternoon recess on November 9, the Court addressed the visitors once again outside the presence of the jury:

> We have many visitors.  You are all welcome.  There are expectations though that to be in this courtroom, you respect the proceedings; and that includes no food and drink, other than water, and also I would appreciate it if people would not talk and murmur or express themselves in either agreement or disagreement with what's being said by counsel out of respect for the proceedings, out of respect for the attorney who is speaking, and out of respect for our jury who is working very hard.  Thank you so much.  I appreciate your cooperation.

The Court never excluded any member of Balkany's family, even after one of them walked into the jury room on the third day of the trial and asked where the jurors had gone for lunch. At the end of the luncheon recess at 2:00 p.m. on November 3, the jury reported to the Deputy that at about 1:30 p.m., a woman had walked into the jury room and asked the four or five jurors who were in the jury room, "Where do you go to eat?  And what time do you get back?"  Following the Court's instructions about how to respond if someone approached them to talk with them, the jurors did not respond to the questions and reported the conversation to the Deputy.  In colloquy with counsel, the interloper was identified as one of the defendant's daughters.

II. Discussion

The petitioner has moved to vacate his conviction on the ground that his Sixth Amendment rights were violated when three family members were excluded from a substantial portion of the voir dire process. The Government opposes the petition on the grounds that it is procedurally barred, that any exclusion was trivial, and that the record as a whole does not support a finding that the Court or the Court's Deputy chose to exclude three of the defendant's family members.

Before addressing the parties' legal contentions, the absence of certain evidence should be noted. First, the Courtroom Deputy has not submitted an affidavit. This is because she has no recollection of any interaction with anyone while the members of the venire were entering the courtroom for this trial or of any interaction with any members of the defendant's family who were not already in the courtroom. This is not surprising. This petition was filed over two years after the events at issue. It would be unusual for anyone to remember what was apparently a brief exchange as the Deputy was handing out questionnaires to sixty venire members. The Deputy's customary practice in handing out questionnaires to members of the venire as they enter the courtroom, a practice that is followed in every trial, has been described above.

There is another set of affidavits that is missing.  There
is no affidavit from Balkany or his counsel, or from any of the
many family members who were sitting in the courtroom during the
entire voir dire.  The defendant has not offered evidence about
how many family members did observe the entire jury selection
process.  And, pointedly, the defendant has not responded to the
Government's argument that it is highly probable that any
exclusion of his children would have been known to Balkany and
his attorney as soon as the lunch break on November 1, 2010.

A. Sixth Amendment Right

The defendant has not shown that there was any violation of
his Sixth Amendment rights.  He does not contend that the trial
proceedings were ever closed to the public.  It is undisputed
that members of the defendant's family and members of the public
attended his entire trial.  The defendant has only shown that
three family members were requested to wait outside the
courtroom briefly as members of the venire entered and were
being seated inside the courtroom.

It is firmly established that all criminal defendants, the
public, and the press have rights under the First and Sixth
Amendments to a public trial.  Waller v. Georgia, 467 U.S. 39,
44 (1984); Presley v. Georgia, 130 S.Ct 721, 723 (2010).  This
right includes the right to attend the portion of the trial
devoted to the selection of the jury.  See Presley, 130 S.Ct at

13

723-25.  In the event that the court decides to exclude the public from any stage of a criminal trial, the court must make findings to support the exclusion, after considering all reasonable alternatives and ensuring that the closure is no broader than necessary to protect a legitimate interest being advanced in favor of exclusion.  See id. at 724.

But, while criminal proceedings must be open to the public, there is a practical limit -- imposed by the size of a courtroom -- over how many members of the public may attend a proceeding.  Considerations of security, decorum, and justice dictate that visitors to the courtroom ordinarily be seated in the gallery of the courtroom that is set aside for public seating.  Most judges do not permit visitors to observe a criminal trial while standing.  Any other practice would risk distracting the jury, interfere with counsels' presentation of the evidence, and unnecessarily burden the Court as it presides over the trial.

When trials are expected to draw a large number of spectators, the judges in this district have at their disposal a number of options to accommodate as many members of the public as possible.  We frequently try to hold such trials in our largest courtrooms.  There are seven such courtrooms in the Daniel Patrick Moynihan Courthouse.  On occasion, separate seating is reserved within the courtroom for categories of people, such as additional counsel, a party's family members,

14

victims, the press, and members of the public, and there are
lines of persons waiting outside the courtroom for an
opportunity to sit in their designated area when a seat becomes
vacant.  Even members of the press must cooperate with each
other in such circumstances and take turns sitting in the
courtroom.  There are also occasions when courtroom proceedings
are televised in an overflow courtroom so that more people may
observe the proceedings.

In this case, however, there was no need for the Court to
even consider limiting the number of courtroom visitors because
of the limitations imposed by the size of the courtroom.  Taking
the three affidavits at face value, all that they have shown is
that the three children were asked on a single occasion by
someone they believe was the Court's "assistant" to wait outside
the courtroom.  From their descriptions, it is clear that this
request was made just after members of the venire had entered
the courtroom.  At that point in time, the sixty or so members
of the venire would have been on the other side of the courtroom
door, moving into the aisles in the courtroom.  The Deputy would
have been moving among them, directing them to be seated in the
pews in the courtroom or instructing them to stand near the
windows until seating for them would become available.  The
defendant's family members and other observers would have been

seated in a bench at the back of the courtroom just to the side
of the entry doors.

There was no infringement of the Constitution to request
visitors to wait briefly while the venire was being seated and
arranged in the courtroom.  While the three children apparently
understood the request "to wait outside" to mean that they could
not enter for the remainder of the morning, that unfortunate
construction was not a necessary one.  The three affiants do not
describe any further conversation with anyone from the Court's
staff.  Instead, they explain that they "remained outside the
courtroom for several hours."  But, after the venire was seated,
everyone in the courtroom was free to come and go.  Indeed, it
is common during the more than two hours between the venire's
arrival and the lunch break for visitors and venire members to
leave the courtroom to use the bathroom facilities and to
return.

There is only one other fact offered by the affiants to
suggest that they were barred entry into the courtroom.  Shmuel
reports that he later entered the vestibule "to try to peek
inside" and saw the Judge's "assistant" allow a reporter to
enter the courtroom.  He says that "the assistant did not let me
or my family members enter."  He does not explain what he means
by that.  He does not report any conversation with the assistant
or explain what the assistant was doing to leave him with the

16

impression that he could not enter.  Indeed, it is entirely
unclear to whom he is referring at this point.  There is no one
on the Court's staff who is positioned near the door after the
questionnaires have been distributed to the venire.  The law
clerk is seated at a table at the front of the courtroom.  For
most of the time, the Deputy is standing behind her desk
directly in the front of the courtroom.  On occasion, she is
assisting members of the venire in the well of the courtroom as
they approach and leave the sidebar.  No one on the Court's
staff is helping reporters or any other visitor to enter or
leave the courtroom.  It is assumed that this affidavit reveals
confusion about courtroom proceedings and what was being
observed.

In sum, accepting the statements of the affiants as true, a
request that a visitor briefly remain outside the courtroom as
members of the venire are moving from the back of the courtroom
into their seats does not constitute a closing of the courtroom
or an exclusion of someone from the courtroom in violation of
the Constitution.  For this reason alone, this petition may be
denied.

B. Procedural Bar

There is a second, independent reason to deny this
petition.  The defendant had a duty to raise any objection about
a violation of his constitutional rights at the earliest moment.

17

He has not shown that he did so.  As a result, this claim is procedurally barred.

A defendant is generally barred from raising a claim through a petition for a writ of habeas corpus that could have been raised on direct appeal.  A defendant may overcome the bar by showing cause for not asserting the claim on direct appeal and prejudice or actual innocence.  Bousley v. United States, 523 U.S. 614, 622 (1998).  To show cause, a petitioner must demonstrate diligence.  See Coleman v. Thompson, 501 U.S. 722, 752 (1991).  An attorney's ignorance or inadvertence is not cause.  Id.

The Government moved to dismiss this petition on the ground that it is "highly probable" that any exclusion of his children from the trial was known to Balkany at the time.  It argued that he has failed to explain why his claim was not raised earlier and why he is not barred for this procedural default.  In reply, Balkany has not denied that he and his attorney learned during that first day of trial that three of Balkany's children believed that they were kept out of the courtroom by the Court's assistant during the morning session.  He relies instead on the fact that the Sixth Amendment claim was not procedurally defaulted since it required further factual development in order to be presented for review.  Bousley, 523 U.S. at 621 (1998).

The existence of cause for a procedural default "ordinarily
requires a showing of some external impediment preventing
counsel from constructing or raising the claim." Murray v.
Carrier, 477 U.S. 478, 492 (1986); see also Coleman, 501 U.S. at
752.  Balkany has presented no such showing.  He conspicuously
fails to argue that he and his attorney were unaware of the
alleged exclusion at the time.  Balkany also fails to present
any specific reasons as to why this claim could not have been
discovered or raised previously.  The absence of any affidavit
from Mr. Brafman or Balkany as to their knowledge is even more
significant given that Balkany's petition was prompted by and
principally relies on the Second Circuit's Gupta decision, and
that Gupta emphasizes that the defendant's attorney did not know
the public had been intentionally excluded from the courtroom at
the time of trial.  Gupta, 699 F.3d at 689 ("the parties do
agree that Gupta's trial counsel was unaware of the [courtroom]
closure at the time it occurred"); see also id. at 687
(courtroom deputy "affirmed that, at the court's direction, he
excluded Gupta's brother and girlfriend from the courtroom
during voir dire").  Merely contending that the record on appeal
contained no indication that any individuals had been excluded
from the courtroom during trial neither demonstrates that
Balkany or his attorneys were ignorant of the allegations at the
time of trial nor forgives the need to demonstrate cause.

Accordingly, Balkany has failed to demonstrate cause excusing the procedural bar to his claim.

CONCLUSION

Balkany's December 6, 2012 petition for a writ of habeas corpus is denied.  In addition, the Court declines to issue a certificate of appealability.  The petitioner has not made a substantial showing of a denial of a federal right, and appellate review is therefore not warranted.  Love v. McCray, 413 F.3d 192, 195 (2d Cir. 2005).  The Court also finds pursuant to 28 U.S.C. § 1915(a)(3) that any appeal by the petitioner from this Order would not be taken in good faith.  Coppedge v. United States, 369 U.S. 438, 445 (1962).  The Clerk of Court shall dismiss this petition and close the case.


SO ORDERED:

Dated:    New York, New York
          March 27, 2013

                                    _____
                                         DENISE COTE
                              United States District Judge

20